# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION

| | | |
|---|---|---|
| W. MARK HAMM, DR. BIJU OOMMEN AND DR. CHRISTOPHER LOCKHART, INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF HELPP INCORPORATED DBA HELPP.AI, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. _____ |
| BROOKS WOOD, DR. HARVEY CASTRO, AND HELPP INCORPORATED DBA HELPP.AI, | ) ) ) ) | JURY TRIAL DEMAND |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiffs W. Mark Hamm ("Mr. Hamm"), Dr. Biju Oommen ("Dr. Oommen"), and Dr. Christopher Lockhart ("Dr. Lockhart") (collectively, "Plaintiffs"), individually and derivatively on behalf of Helpp Incorporated dba Helpp.ai ("Helpp.ai"), state as follows for their Complaint against Defendants Brooks Wood ("Mr. Wood"), Dr. Harvey Castro ("Dr. Castro"), and Helpp.ai (collectively, "Defendants"):

## NATURE OF CASE

1.      This is a securities fraud lawsuit in which Defendants Mr. Wood and Dr. Castro fraudulently induced Plaintiffs to become investors in Defendant Helpp.ai by making various misrepresentations and omissions of material fact which they knew to be false. To compound matters, after defrauding Plaintiffs into investing in the company, Defendant Mr. Wood breached his fiduciary duties as an officer and controlling stockholder and also caused Helpp.ai to breach

its contractual obligations to Plaintiffs by grossly mismanaging Helpp.ai's financial affairs and using company funds for personal expenditures.

## THE PARTIES

2.      Mr. Hamm is a resident and citizen of the State of Tennessee. At all relevant times herein, Mr. Hamm lived and maintained his principal place of business in Knoxville, Tennessee. Mr. Hamm has about 25 years of experience in the healthcare industry and has served as the CEO of multiple healthcare companies.

3.      Dr. Oommen is a resident and citizen of the State of Texas. Dr. Oommen has been a licensed medical doctor since 1996 and specializes in geriatric medicine.

4.      Dr. Lockhart is a resident and citizen of the State of Texas. Dr. Lockhart has been a licensed medical doctor since 1991 and specializes in internal medicine.

5.      Mr. Wood is a resident and citizen of the State of Colorado. Mr. Wood is the co-founder, President, CEO, and Executive Chairman of Helpp.ai. Additionally, Mr. Wood and his wife Lauryn Wood are the controlling stockholders of Helpp.ai, with each owning 40.954% of the outstanding stock in the company.

6.      Dr. Castro is a resident and citizen of the State of Texas. Dr. Castro is the "Chief Medical AI Officer" of Helpp.ai. On information and belief, Dr. Castro is also a stockholder of Helpp.ai, either individually or through an entity he owns and/or controls. At all relevant times herein, Dr. Castro has held himself out as an expert in the use of Artificial Intelligence ("AI") in healthcare applications. On his personal website, www.harveycastromd.com, Dr. Castro states:

> Welcome to the home of Dr. Harvey Castro, an esteemed innovator at the forefront of artificial intelligence (AI) in healthcare. As a physician, entrepreneur, and consultant, Dr. Castro harnesses AI to transform healthcare practices, improve patient outcomes, and streamline operations.

2

7.     Helpp.ai is a company existing under the laws of the State of Delaware and has its principal place of business located in Denver, Colorado.  Helpp.ai can be served through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE  19801.

## JURISDICTION AND VENUE

8.     Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction over Plaintiffs' claim under the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10b-5, 17 C.F.R. § 240.10b-5.

9.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs' state law claims because those claims arise from and form part of the same controversy from which Plaintiffs seek relief on their federal law claim.

10.     The Court has personal jurisdiction over each of Defendants because they have transacted business in Tennessee (including in Knoxville), engaged in at least some of the wrongful acts alleged herein in Tennessee, engaged in at least some of the wrongful acts alleged herein outside of Tennessee that have caused Mr. Hamm to suffer harm within Tennessee, and/or directed their wrongful acts alleged herein to Mr. Hamm in Tennessee (including in Knoxville).

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and (b)(3).

## FACTUAL BACKGROUND

12.     Beginning around 2013, Mr. Hamm participated in developing innovative software for use in hospital emergency rooms.  In 2023, with the advent of AI technology, Mr. Hamm was considering developing an improved, AI-based version of that software.

13.     In November 2023, Mr. Hamm was introduced to Dr. Castro on a conference call held in connection with a physician executive MBA program at the University of Tennessee.

During that call, Dr. Castro represented that he had been an emergency room doctor and was an expert in AI software for use in healthcare applications. Based on Dr. Castro's stated background, Mr. Hamm later contacted Dr. Castro to discuss his proposed software project. During their discussions, Dr. Castro recommended that Mr. Hamm also meet with Mr. Wood, who Dr. Castro represented was similarly an expert in AI software for use in healthcare applications.

14.     Beginning in late November 2023, Mr. Hamm, Mr. Wood, and Dr. Castro had multiple telephone conversations and exchanged multiple emails. During their communications, Mr. Wood and Dr. Castro represented that Mr. Wood was one of the co-founders of Helpp.ai, that Mr. Wood was the President, CEO, and Executive Chairman of Helpp.ai, and that Dr. Castro was the Chief Medical Officer of Helpp.ai, which they referred to as the "Chief Medical AI Officer." Mr. Hamm later learned that Dr. Castro's role also included soliciting potential investors in Helpp.ai.

15.     Mr. Wood and Dr. Castro represented that Helpp.ai had developed a product that could accurately predict and prevent patients in hospitals and other settings from falling, including falling in what are referred to as "unassisted bed exits." Mr. Wood and Dr. Castro represented that Helpp.ai's product consisted of "computer vision" cameras that can monitor patients in their beds and AI-driven software that can accurately predict when a patient is going to try to exit the bed or otherwise fall and then promptly alert nursing staff.

16.     Based on his background in the healthcare industry, Mr. Hamm knew that patient falls in hospitals and long-term care settings, such as nursing homes, are quite common and present an enormous problem for healthcare administrators, because they can lead to serious injuries and even deaths and create potential legal liability for healthcare facilities. Thus, Mr. Hamm believed

4

that a product that could accurately and effectively prevent patient falls would have commercial value.

17. During their discussions, Mr. Wood and Dr. Castro sought to convince Mr. Hamm to defer his own AI software project and join Helpp.ai's executive team as the CEO. Mr. Wood and Dr. Castro represented that they believed that, based on his background, Mr. Hamm could help them grow the company. Mr. Wood and Dr. Castro also sought to convince Mr. Hamm to invest money and become a stockholder in the company.

18. Based on Defendants' representations regarding Helpp.ai's product and its capabilities, Mr. Hamm expressed interest in becoming the company's CEO and possibly investing in the company. Indeed, based on Defendants' representations, Mr. Hamm put Mr. Wood and Dr. Castro in contact with Dr. Oommen and Dr. Lockhart as additional potential investors in the company. Just like Mr. Hamm, based on their personal experience in hospitals and nursing homes, Dr. Oommen and Dr. Lockhart knew that patient falls are a significant problem in the healthcare industry and that a product that could accurately predict and effectively prevent them would have commercial value.

19. From late November 2023 forward, Mr. Wood and Dr. Castro emailed Plaintiffs PowerPoint presentations, a written business plan, and other documents which contained the following representations, among others:

    a. Helpp.ai's product had been demonstrated to eliminate over 90% of falls and related injuries and deaths;

    b. Helpp.ai's product was in place in several hospitals in Georgia and Texas and that the hospitals had budgeted to purchase additional units "housewide;"

c. Helpp.ai's early successes allowed the company to market its product to large healthcare facilities in Connecticut and Massachusetts;

d. Helpp.ai was projecting sales for fiscal year 2025 of $2,500,000 and sales for fiscal year 2026 of $25,000,000, all with a profit margin above 80%;

e. Helpp.ai's co-founders, including Mr. Wood and his wife, were only drawing minimal salaries so that company funds could be used to grow the company; and

f. Helpp.ai had already developed a network of distributors and highly trained healthcare experts across the country who were actively marketing and selling the company's products.

20. On March 20, 2024, on a conference call with Plaintiffs designed to convince them to invest in Helpp.ai, Mr. Wood and Dr. Castro went through the written materials they previously provided and repeated the same representations as set forth above. Additionally, on that call, Defendants further represented:

a. Helpp.ai was about to receive an order from a large hospital in Houston for units sufficient to monitor 100 patient beds;

b. Helpp.ai had recently installed one of its units at a large hospital in Connecticut, and the hospital had already budgeted the purchase of additional units sufficient to monitor patient 500 beds; and

c. Helpp.ai's distributors were already installing Helpp.ai's units for customers and providing customers with training, maintenance, and ongoing support.

21. In sum, Mr. Wood and Dr. Castro repeatedly represented that Helpp.ai was an active and ongoing business operation, that Helpp.ai had an existing commercial product and the

product had been thoroughly tested for performance characteristics, that Helpp.ai's product had actually been installed and was in operation at various hospitals across the United States, that Helpp.ai had already received purchase commitments from various customers, and that Helpp.ai had a robust distribution and support network already in place. Indeed, consistent with these representations, at the time Plaintiffs filed this Complaint, Dr. Castro described Helpp.ai on his Linkedin profile as follows:



**Chief Medical AI Officer**
Helpp.ai · Part-time
Mar 2024 - Present · 5 mos
Denver, Colorado, United States · Hybrid

Helpp.ai revolutionizes healthcare with AI-driven fall prevention and workflow automation, targeting the significant challenge of patient falls—a problem costing US healthcare $34 billion annually. Our platform leverages ambient intelligence to provide early warnings, reducing falls and enhancing patient safety.

Beyond fall prevention, helpp.ai automates healthcare workflows, alleviating practitioner burnout and improving care quality. It adapts to changing patient needs, optimizes care delivery, and supports clinical decision-making with timely insights. This integration of technology into healthcare not only improves patient outcomes but also operational efficiency.

Designed to seamlessly integrate into existing systems, helpp.ai offers a scalable solution for improving patient outcomes and efficiency in hospitals and care facilities. Our technology streamlines clinical decisions, ensures compliance with healthcare standards, and allows healthcare professionals to focus on delivering exceptional care.

22.     Based on Defendants' representations, Plaintiffs each agreed to invest $250,000.00 in Helpp.ai, for a combined total of $750,000.

23.     Instead of issuing Plaintiffs a direct equity interest in the company, Defendants represented that it would be easier and more cost-effective for the parties to enter a post-money SAFE (Simple Agreement for Future Equity) pursuant to which Plaintiffs would invest their funds and have rights to convert their SAFE to equity shares upon certain terms in the future.

24.     On or about March 26, 2024, each of the Plaintiffs and Helpp.ai entered into a separate "Carta Post-Money SAFE (Simple Agreement for Future Equity)."[1]  A true and correct

---

[1] Each of the Plaintiffs' agreements is referred to herein as a "SAFE."  Plaintiffs' agreements are referred to herein collectively as "SAFEs."

copy of Mr. Hamm's SAFE is attached hereto as <u>Exhibit A</u>. The terms of Dr. Oommen's and Dr. Lockhart's SAFE, copies of which Defendants already possesses, are identical.

25.     The SAFEs provide that in exchange for Plaintiffs' investments, the SAFEs would automatically convert into a certain number of shares of preferred stock in the event that Helpp.ai issues or sells preferred stock in the aggregate amount of at least $1,000,000.00  The SAFEs further provide that each of the Plaintiffs would be entitled to certain proceeds and/or benefits in the event of a change of control, direct listing, or initial public offering.

26.     Section 7(h) of each of the SAFEs provides:  "The Company shall use the proceeds of this SAFE solely for the operations of its business, and not for any personal, family, or household purposes."

27.     In conjunction with Plaintiffs' investments, Mr. Wood and Dr. Castro agreed that Mr. Hamm would serve as Helpp.ai's acting CEO, while Mr. Wood would remain the president and Dr. Castro would remain the Chief Medical Officer.  As it turned out, however, Mr. Hamm was the CEO in name only.   Mr. Wood continued to operate the company and take actions without Mr. Hamm's knowledge, input, or approval, including handling the company's financial affairs.

28.     By June 2024, Mr. Hamm discovered that practically everything Mr. Wood and Dr. Castro had represented to Plaintiffs prior to their investments in the company was completely false.

29.     Defendants' representations that Helpp.ai had its product installed and in use at multiple hospitals around the country was a complete fabrication.  By June 2024, Helpp.ai did not have a single product installed and in use at any medical facility.

30.     Defendants' representations that Helpp.ai had secured commitments from hospitals for the purchase of Helpp.ai's product was also a complete fabrication.  By June 2024, Helpp.ai had not secured any such commitments from any customer or potential customer.

31.     Defendants' representation that Helpp.ai's product had been demonstrated to eliminate over 90% of falls and related injuries and deaths also was a complete fabrication.  After Plaintiffs made their investments, and upon discovering that Defendants had made certain misrepresentations to Plaintiffs, Mr. Hamm's repeatedly requested that Mr. Wood provide data that would support that assertion or that would show that Helpp.ai's product had been subjected to any type of testing to assess its functionality or accuracy in predicting patient falls.  However, Mr. Wood failed to provide any such information.  On information and belief, contrary to Defendants' assertions, Helpp.ai does not have an operational product that can predict or prevent patient falls.

32.     Defendants' representation that Helpp.ai had a robust distribution network that had already installed Helpp.ai's products at customer locations was also a complete fabrication.  Again, by June 2024, Helpp.ai did not have a single product installed and in use at any medical facility.

33.     Mr. Hamm also discovered that Mr. Wood had engaged in numerous financial irregularities, both before and after Plaintiffs invested in the company, all during periods in which Helpp.ai had limited available cash.

34.     For example, Helpp.ai's records showed that Mr. Wood used $55,879 of the company's funds to purchase an Infiniti vehicle that had no business purpose, but instead, was for Mr. Wood's personal use.

35.     As another example, despite Defendants' representation that Mr. Wood and his wife were only taking minimal salaries, Helpp.ai's records showed that Mr. Woods was routinely making substantial transfers of funds—often in round dollar figures—from the company's bank account to his personal bank account at Chase Bank and to another bank account at Chase Bank, the owner of which is currently unknown.  On information and belief, these transfers were made by Mr. Woods to accounts he owns and controls for his own personal benefit.

36.     As another example, Helpp.ai's records showed that the payees on certain transfers of funds were left blank.  When Mr. Hamm pressed Mr. Wood to explain these items, Mr. Wood failed to do so.  Instead, Mr. Wood accessed Helpp.ai's accounting program and manually added alleged payees, raising a red flag as to their legitimacy.  On information and belief, these transfers were made by Mr. Woods to accounts he owns and controls for his own personal benefit.

37.     When Mr. Hamm requested that Mr. Wood provide invoices and receipts for various company expenditures, Mr. Wood sent Mr. Hamm an email stating:  "I am more than willing to provide invoices and receipts."  However, Mr. Wood failed to do so.  When Mr. Hamm continued to press Mr. Wood, Mr. Wood blocked Mr. Hamm's continued access to Helpp.ai's accounting software.  Finally, on June 13, 2024, Mr. Wood sent Mr. Hamm an email revoking the offer for Mr. Hamm to be the CEO of the company, stating:

> Dear Mark,
>
> I hope this email finds you well.
>
> I wanted to thank for your interest in the CEO position at helpp.  We were impressed with your resume and the initial discussions we had about our company's future.
>
> After careful consideration and discussions with our board and key stakeholders, we have decided to move in a different direction regarding the leadership of helpp.   While we appreciate your enthusiasm and insights, we have determined that our leadership styles and vision for the company are not fully aligned at this time.
>
> I want to express my gratitude for your patience throughout this process.
>
> Although we won't be moving forward with a formal offer, thank you once again for your time and interest in helpp.
>
> Best regards,
>
> **Brooks Wood**
> President/CEO
> (720) 285-9636
> https://helpp.ai

38.     Upon discovering Defendants' wrongful actions, Plaintiffs demanded that Mr. Woods return the money they invested in Helpp.ai.  Mr. Wood ignored that request.  Instead, Mr. Wood sent Mr. Hamm an email demanding that Mr. Hamm "cease and desist" from making what Mr. Woods wrongly characterized as "false and defamatory" statements regarding Helpp.ai.  On information and belief, Mr. Woods sent this email for the purpose of attempting to silence Mr. Hamm and deter him from advising other investors in Helpp.ai of Defendants' wrongful actions.

39.     Plaintiffs did not make a demand on Helpp.ai's Board to bring this action against Defendants because such a demand would have been futile.  Mr. Wood is the Executive Chairman of the Board, and Mr. Wood's wife is one of two additional directors.  Mr. Wood has already effectively rebuffed Plaintiffs' efforts to resolve this matter.  Thus, it was reasonable for Plaintiffs to assume that Mr. Wood and his wife would similarly rebuff any demand to pursue an action against Mr. Wood.

## COUNT I

## Violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, *et seq.* and Rule 10b-5, 17 C.F.R. § 240.10b-5

### (Asserted Against All Defendants)

40.     Plaintiffs restate the allegations set forth above and incorporate those allegations herein by reference.

41.     Plaintiffs' SAFEs constitute securities under the Securities Exchange Act of 1934, 15 U.S.C. § 78j, *et seq.* and Rule 10b-5, 17 C.F.R. § 240.10b-5.

42.     Defendants disseminated and approved by means or instrumentality of interstate commerce the false and misleading representations to Plaintiffs alleged herein and engaged in the manipulative and deceptive acts alleged herein to effectuate the sale and purchase of securities.

43. Defendants engaged in the deceptive acts and practices alleged herein knowing that they were making false representations and omissions of material fact. Alternatively, Defendants engaged in the deceptive acts and practices alleged herein with deliberate disregard of the truth and the misleading nature of their representations and omissions of material fact.

44. Defendants' misrepresentations and omissions as alleged herein were highly material to Plaintiffs in making their decision to invest in Helpp.ai and enter the SAFEs, and those misrepresentations and omissions would have been deemed material to the reasonably prudent investor. Plaintiffs would never have invested in Helpp.ai or entered the SAFEs had they been aware of the true and correct facts.

45. Defendants' deceptive acts and practices as alleged herein operated to perpetuate a fraud and deceit upon Plaintiffs.

46. In reasonable reliance on Defendants' misrepresentations and/or omissions of material fact, Plaintiffs have suffered injury in that Plaintiffs purchased securities in Helpp.ai that have limited or no value.

47. In addition to their compensatory damages, Plaintiffs are entitled to punitive and exemplary damages based on Defendants' intentional and willful misconduct.

## COUNT II

**Violation of the Tennessee Securities Act of 1980, Tenn. Code Ann. Section 48-1-121, et seq.**

**(Asserted Against All Defendants)**

48. Plaintiffs restate the allegations set forth above and incorporate those allegations herein by reference.

49. Plaintiffs' SAFEs constitute securities under Tenn. Code Ann. Section 48-1-121, *et seq.*

50.     Defendants engaged in a device, scheme, or artifice to defraud Plaintiffs in connection with the sale and purchase of securities.

51.     Defendants made untrue statements of material fact or omitted to state material facts in connection with Plaintiffs' investment in Helpp.ai and their entering into the SAFEs.

52.     Defendants engaged in the deceptive acts and practices alleged herein with an intent to deceive, knowing that they were making false representations and omissions of material fact.

53.     Defendants' misrepresentations and omissions were highly material to Plaintiffs in making their decision to invest in Helpp.ai and enter the SAFEs, and those misrepresentations and omissions would have been deemed material to the reasonably prudent investor.  Plaintiffs would never have invested in Helpp.ai or entered the SAFEs had they been aware of the true and correct facts.

54.     Defendants' deceptive acts and practices as alleged herein operated to perpetuate a fraud and deceit upon Plaintiffs.

55.     In reasonable reliance on Defendants' misrepresentations and/or omissions, Plaintiffs have suffered injury in that Plaintiffs purchased securities in Helpp.ai that have limited or no value.

56.     In addition to their compensatory damages, Plaintiffs are entitled to punitive and exemplary damages based on Defendants' intentional and willful misconduct.

## COUNT III

### Common Law Fraud and Fraudulent Inducement

### (Asserted Against All Defendants)

57.     Plaintiffs restate the allegations set forth above and incorporate those allegations herein by reference.

58.     Defendants made the representations alleged herein for the purpose of inducing Plaintiffs to invest in Helpp.ai and to enter the SAFEs.

59.     Defendants' representations were false, misleading, and made without a good faith basis.  Defendants knew or should have known that the representations were false and misleading.

60.     Plaintiffs reasonably relied on Defendants' misrepresentations in agreeing to invest in Helpp.ai and enter the SAFEs.   Plaintiffs would not have done either absent Defendants' misrepresentations and omissions of material fact.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

62.     In addition to their compensatory damages, Plaintiffs are entitled to punitive and exemplary damages based on Defendants' intentional and willful misconduct.

63.     Alternatively, Plaintiffs seek rescission of the SAFEs and a return of their investment proceeds.

## COUNT IV

## Common Law Negligent Misrepresentation

### (Asserted Against All Defendants)

64.     Plaintiffs restate the allegations set forth above and incorporate those allegations herein by reference.

65.     Defendants made the representations alleged herein for the purpose of inducing Plaintiffs to invest in Helpp.ai and to enter the SAFEs.

66.     Defendants failed to exercise reasonable care to verify that the representations they made to Plaintiffs were accurate.

67.     Plaintiffs reasonably relied on Defendants' representations in agreeing to invest in Helpp.ai and enter the SAFEs.  Plaintiffs would not have done either absent Defendants' misrepresentations and omissions of material fact.

68.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

**COUNT V**

**Breach of Fiduciary Duty**

**(Asserted Individually and Derivatively Against Defendant Mr. Wood)**

69.     Plaintiffs restate the allegations set forth above and incorporate those allegations herein by reference.

70.     As an officer, director, and controlling stockholder of Helpp.ai, Mr. Wood owed fiduciary duties of loyalty and care to the company, and also to Plaintiffs and other investors in the company.  To comply with these duties, Mr. Wood was prohibited from taking any action that would:  (a) adversely affects the company and/or the value of Plaintiffs' investment in the company, (b) provide himself with preferential treatment at the expense of the company and/or Plaintiffs and other investors, and/or (c) unjustly enrich himself at the expense or to the detriment of the company and/or Plaintiffs and other investors.

71.     On information and belief, Mr. Wood knowingly violated his fiduciary duties, including his duties of loyalty and care, by putting his personal interests ahead of the interests of the company and Plaintiffs and other investors and engaging in conflicted transactions in which he wrongfully transferred or caused to be transferred company funds to himself for his own personal use and benefit.  These transactions had no legitimate business objective but were intended solely to enrich Mr. Wood personally and/or his family members.

72.     As a direct and proximate result of Mr. Wood's wrongful conduct, the company and Plaintiffs have suffered damages in an amount to be proven at trial.

73.     In addition to their compensatory damages, Plaintiffs are entitled to punitive and exemplary damages based on Mr. Wood's intentional and willful misconduct.

## COUNT VI

### Breach of Contract

### (Asserted Against Defendant Helpp.ai)

74.     Plaintiffs restate the allegations set forth above and incorporate those allegations herein by reference.

75.     Plaintiffs' SAFEs represent valid and enforceable contracts between Plaintiffs and Helpp.ai.

76.     Section 7(h) of the SAFEs provides:  "The Company shall use the proceeds of this SAFE solely for the operations of its business, and not for any personal, family, or household purposes."

77.     On information and belief, Helpp.ai breached the SAFEs by causing proceeds that Plaintiffs provided to the company under the SAFEs to be used for the personal, family, or household purposes of Mr. Wood and/or his family members.

78.     As a direct and proximate result of Helpp.ai's breach, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT VII

### Violation of Tenn. Code Ann. § 47-50-109 and Common Law Inducement to Breach Contract

#### (Asserted Against Defendant Mr. Wood)

79. Plaintiffs restate the allegations set forth above and incorporate those allegations herein by reference.

80. Mr. Wood was aware of the contractual provisions of the SAFEs between Plaintiffs and Helpp.ai.

81. On information and belief, Mr. Wood intentionally induced Helpp.ai to breach the SAFEs by causing Helpp.ai to use funds that Plaintiffs provided the company under the SAFEs for the personal, family, or household purposes of Mr. Wood and/or his family members.

82. As a direct and proximate result of Mr. Woods' wrongful actions, Plaintiffs have suffered damages in an amount to be proven at trial.

83. In addition to their compensatory damages, Plaintiffs are entitled to punitive and enhanced damages based on Mr. Wood's intentional and willful misconduct.

## COUNT VIII

### Breach of Oral Contract

#### (Asserted Against Defendants Helpp.ai)

84. Plaintiffs restate the allegations set forth above and incorporate those allegations herein by reference.

85. Mr. Hamm and Mr. Wood, on behalf of Helpp.ai, agreed that during the time Mr. Hamm served as the acting CEO of the company, Helpp.ai would reimburse Mr. Hamm for the reasonable business expenses he incurred on behalf of and for the benefit of the company.

86.     During the time that Mr. Hamm served as the acting CEO, he incurred $2,846.16 in business expenses, which were reasonable and incurred on behalf of and for the benefit of Helpp.ai.

87.     Helpp.ai breached its agreement with Mr. Hamm by refusing to reimburse him those expenses.

88.     As a direct and proximate result of Helpp.ai's breach, Mr. Hamm has been damaged in the amount of $2,846.16.   Alternatively, Helpp.ai has been unjustly enriched and should be required to repay Mr. Hamm in that amount.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that they be granted the following relief as to Defendants, and each of them:

1. Judgment in their favor against Defendants, jointly and severally;

2. An award of compensatory damages in an amount to be proven at trial;

3. An award of punitive and exemplary damages in an amount to be proven at trial;

4. A judgment of rescission of Plaintiffs' SAFEs and a return of their investment proceeds;

5. An award of pre-judgement and post-judgment interest as provided by law;

6. An award of their reasonable attorneys' fees incurred herein; and

7. Such other further relief to which Plaintiffs may be entitled.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues triable by right by jury.

Respectfully submitted:


*/s/Michael R. O'Neill*
W. Scott Sims (#17563)
Michael R. O'Neill (#34982)
SIMS|FUNK, PLC
3102 West End Ave., Ste. 1100
Nashville, TN 37203
(615) 292-9335
ssims@simsfunk.com
moneill@simsfunk.com

*Attorneys for Plaintiffs*